**BROOKS v. UNITED STATES.**

Civ. No. 174.

United States District Court,
E. D. North Carolina,
Elizabeth City Division.

June 26, 1951.

John H. Hall, J. Henry LeRoy, Elizabeth City, N. C., for plaintiff.

Howard H. Hubbard, Asst. U. S. Atty., Logan D. Howell, Asst. U. S. Atty., Raleigh, N. C., for defendant.

GILLIAM, District Judge.

Upon the pleadings, admissions and stipulations of the parties and the evidence presented, the Court finds these facts:

### Findings of Facts.

1. The action was instituted on July 24, 1947, for damages arising from the death of Birvin Brooks, which occurred on the 26th day of July, 1945, and is cognizable under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq.; the plaintiff herein, Alphine B. Brooks, is the widow of Birvin Brooks, who was a citizen and resident of Pasquotank County, N. C., within the Eastern District of North Carolina and the Elizabeth City Division. Alphine B. Brooks is the duly qualified and acting administratrix of the estate, having so qualified in the Superior Court of Pasquotank County, N. C.; hereinafter Birvin Brooks will be referred to as "the deceased".

2. On the date upon which the deceased received his fatal injuries he was employed as an unskilled laborer and helper by one R. S. Jordan, who was doing business as R. S. Jordan Company, a plumbing, heating and electrical contractor; and on that date the deceased was engaged in doing certain work in a fire pump house located on property near Elizabeth City, N. C., owned by the Government and upon which it had formerly established and maintained a Naval Air Base. The Base was located on real estate owned by the Government, with certain improvements and installations thereon, including the pump house above mentioned; and all such improvements and installations were the property of the Government, and had been constructed prior to the date of the contract between the Government and Consolidated Vultee Aircraft Corp., hereinafter mentioned; while the deceased was working in said pump house, and in connection with his employ-

ment and under circumstances hereinafter detailed, he received injuries from an explosion from which he died on the following day, that is, July 27, 1945.

3. The pump house was a part of the facilities which had been provided by the Government for protection of its property against fire, being a facility through which the water supply was furnished; it was constructed entirely of concrete and steel, and consisted of three rooms or compartments—one on the ground level covering the entire floor space, and two below, these latter two being separated by a reinforced concrete partition 12 inches thick; one of these lower compartments was known as a wet well, and the other as a dry well; entrance to the dry well, with which we are here concerned, was allowed by an opening (36 in. x 36 in.) through the concrete floor of the upper room, and a stationary steel ladder leading down to the concrete floor below; the following equipment was located in the upper compartment; two gasoline engines, two electrically driven pumps, numerous switches, and part of the pumping equipment; and in the dry well below there was located a part of the pumping equipment and a sump pump which had been installed to pump out water that might leak into and accumulate on the floor of the dry well; this sump pump was driven by an electric motor which was put into action when a float installed near the floor was raised sufficiently by the rise of the water on the floor to operate an electric switch; when this float would drop to a predetermined point as a result of the fall of the water level, the electric motor would cease operating; when in working order the entire operation of this sump pump and electric motor was automatic; the dry well, which was entirely enclosed in concrete save for the opening from the main floor above, was 15 ft. x 15 ft., 18 ft. deep; it was lighted by electricity, and at the time of the explosion the lighting was furnished by a 150 watt bulb in the ceiling of the dry well, which was protected by a guard; the gasoline pipe, of ½ in. galvanized iron, through which gasoline was supplied to the engines on the main floor, led from an outside storage tank through the outside concrete wall into the dry well, and thereafter along the ceiling of the dry well, to which it was attached, and then through the concrete floor to the gasoline engines in the upper compartment; this gas line was connected by pipe fittings to the two pumps within the dry well; through the ceiling of the dry well a return pipe extended from each gasoline engine above, which were equipped with a gate valve designed to prevent the dripping of the gasoline from the pipes, except when upon occasion, due to accumulation of gasoline or water, it became necessary to open the valve and drain the return pipes; at the time of explosion this valve was closed; but on one occasion shortly before the explosion it was found in leaky condition; the return pipes might at times contain as much as a gallon of gasoline which had accumulated as it returned from the engine's carburetors.

4. Prior to the 14th day of November, 1942, the Government, as above indicated, was the owner and was operating through the Navy Department the Air Base near Elizabeth City, N. C., including the pump house and equipment therein, and on that date entered into a contract with Consolidated Vultee Aircraft Corporation, which will be hereinafter referred to as "Convair", by the terms of which Convair agreed "to flight deliver airplanes * * * to Elizabeth City, N. C., and from Elizabeth City to any other place or places in the world, to repair, modify, alter and service such airplanes, and to install equipment and fuel therein and to undertake instruction in connection therewith at the estimated cost of $6,000.00 per month for the training period". This contract was amended in several respects not affecting its general nature through April 30, 1944, and it was what is generally referred to as a "cost-plus fixed-fee contract". (This contract, with amendments, constitute plaintiff's Exhibit No. 1.) It was in effect on July 26, 1945, the date of the explosion which resulted in fatal injuries to the deceased. Under it Convair had full possession and control of all the facilities at the Air Base except office space for Navy personnel stationed on the Base for inspections of operations and installations, to see that the de-

fendant's property was properly maintained and protected, and the contract properly performed; Convair bought and furnished all material, employed all personnel, engaged in operations, and was in charge of the entire operation under the contract subject to certain rights of inspection and rejection set forth in the contract. While the Government had no part in employing the personnel, it did reserve and exercise the right to require the dismissal of any employee who was found to be delinquent in the performance of his duties; from the time Convair began performance and until the date of the accident Convair operated and maintained all equipment and buildings on the Base, including the fire pumps, auxiliary pumps, sump pump located in the dry well under the pump house where the explosion, with its fatal results, occurred; employed the personnel and carried out the business of protecting the property from fire. The Base was enclosed by a steel wire fence and all entrances were guarded by Convair, which issued all passes for persons entering the Base.

5. Prior to September 5, 1944, the Government entered into a contract with Doyle & Russell for the installation of certain additional facilities on the property, including a third pump for the above mentioned pump house. (This contract is Plaintiff's Exhibit No. 2.) Under the contract Doyle & Russell were independent contractors, that is, they contracted to do certain work according to their own methods, with their own equipment, with their own employees, and were subject to no control by the Government except as to the product or result of their work.

6. By contract dated September 5, 1944, Doyle & Russell, General Contractors, entered into a contract with R. S. Jordan Company to install the additional pump in the pump house. (This contract is Plaintiff's Exhibit No. 3.) Under it R. S. Jordan Company acted as an independent contractor in that it, with respect to the installation of the third pump, was to install it according to its own methods, by its own employees, subject to no control of the defendant except as to the end result.

7. The R. S. Jordan Company began work under the contract in October, 1944, but it was not until July, 1945, when that part of the work was reached during which the fatal explosion occurred; several months before that date the R. S. Jordan Company had removed a portion of the electrical equipment from the upper compartment to the outside of the building, in order to provide room for the third pump to be installed, and at the time of the explosion was engaged in certain work preliminary to the actual placing of the third pump; as a step in this preliminary procedure, it was necessary to construct within the dry well a staging upon which the workmen might stand; the erection of this stage was in progress at the time the explosion occurred. The platform of the staging was eight to ten feet above the floor of the dry well, and extended over the entire area of the floor space except for an opening therein permitting the use of the stationary steel ladder leading down from the upper compartment.

8. When the workmen, including deceased, began work upon the staging on the fatal morning, there was an accumulation of water upon the floor of the dry well, and as otherwise the workmen would be required to stand in water at their work, the deceased went down into the dry well for the purpose of starting the motor of the sump pump, which was at the time out of order and had not started automatically upon the rise of the water as it was designed to do; the deceased, upon reaching the motor, made one or more unsuccessful attempts to start it by "pushing on the switch", and as he "pushed the switch again" a flash and an explosion, followed by fire, occurred resulting in fatal burns and injuries to the deceased; no other person was in the dry well at the time.

9. At the time deceased went into the dry well, the air therein was highly saturated with explosive fumes or vapors, and gasoline was leaking from the union in the gas line within the dry well.

10. The explosion was caused by the ignition of the explosive vapors in the air within the dry well by a spark originating from the electric switch when "pushed" or

moved by the deceased in his effort to start the motor and pump, and the explosion was the proximate cause of the fatal injuries to deceased.

11. Subsequent to the contract between the Government and Convair, and until the fatal explosion, the manning, maintenance and operation of the fire protection equipment and facilities, including the pump house and all of its equipment, were continuously under full control and supervision of Convair, which caused regular inspections to be made for the purpose of maintaining the fitness and safety of such equipment; while the Government exercised a general supervision of the equipment, facilities and installations, for the purpose of protecting its property and insuring the proper performance of the contract, it had no part in the operation of the pump house or any of the other fire protection equipment and exercised no control of the means and methods employed in such operation; it was no part of the duties of either Doyle & Russell or R. S. Jordan Company, under their contracts, to inspect or otherwise control the operation of the pump house or any of the fire protection equipment, all of which was the property of the Government.

12. At the time of the contract between the Government and Convair by which, as above found, the custody, control and responsibility of inspection were committed to Convair, the fire protection equipment and facilities were in fit, proper and safe condition, and there was no fact or circumstance or combination of facts or circumstances thereafter brought to the attention of the Government to put it on notice that a condition or situation such as existed at the time of the explosion would develop; and no fact or circumstance came to the Government's attention thereafter to put it on notice that such a situation might reasonably develop, or that it could not reasonably expect Convair, which took over full control and which maintained a fully manned safety protection program, to properly protect those lawfully on the Base, particularly the deceased.

13. The dry well, at the time it was entered by the deceased in the performance of his duty, was not maintained in a reasonably safe condition, but this fact was not known to the R. S. Jordan Company or to the deceased, or to the Government.

14. As between the defendant and R. S. Jordan Company and their employees, including the deceased, the defendant had the exclusive care and control of the fire pump house and its installations, including the dry well, the gasoline line, and the sump pump.

15. The deceased was an unskilled laborer, 37 years of age and of good habits and health, who was supporting his wife and several children; his average weekly wage had been $35.

16. The plaintiff Hartford Accident & Indemnity Company was the insurance carrier of R. S. Jordan Company under the North Carolina Workmen's Compensation Act, and having paid the amount of $6,000 to the dependents of the deceased is subrogated to any recovery herein to that extent, less a credit of $2,000 paid to it by Convair as consideration for a covenant not to sue.

17. The death of plaintiff's intestate was not caused by the negligence of the defendant.

Conclusions of Law.

Upon the foregoing facts, the Court concludes:

1. That the plaintiff is entitled to recover nothing of the defendant; and

2. That the costs of the action be taxed against the plaintiff.

■■■ As it appears to me, this is not a proper case for the application of the doctrine of res ipsa loquitur, as plaintiff contends, inasmuch as "the instrumentality (or equipment) causing the injury (was) not under the exclusive control or management of the defendant." Sutton v. Texas Co., 4 Cir., 1950, 183 F.2d 383, 385; Dail v. Taylor, 151 N.C. 284, 285, 287, 66 S.E. 135, 28 L.R.A.,N.S., 949; Womble v. Merchants' Grocery Co., 135 N.C. 474, 47 S.E. 493; Saunders v. Norfolk & W. Railroad Co., 185 N.C. 289, 117 S.E. 4, 29 A.L.R. 1258. While the defendant owned the property and equipment here involved and had the right of control over it, at the time of the fatal

explosion and for some time prior thereto it was not "under the exclusive control or management" of the Government. The Government had not since November, 1941, the date of the contract between it and Convair, exercised any actual control or management of the pump house and the equipment therein. Even if applied, it constitutes only evidence of negligence.

■ But under general principles, and upon evidence in addition to the mere fact of the explosion, without the aid of the doctrine of res ipsa loquitur, these reasonable inferences and findings seem justified: (a) the cause of the fatal explosion was the ignition of gasoline vapors which saturated the atmosphere within the dry well; (b) the gasoline from which the vapors originated became exposed to the atmosphere in the dry well by reason of a leak in the equipment which had been installed by the Government on its own property and which was in no way involved in or affected by the work being done by the deceased for his employer, R. S. Jordan Co.; (c) the spark which ignited the explosive vapors was produced by the electric switch which the deceased was unsuccessfully undertaking to operate by hand after it had failed to operate automatically as designed to do; and (d) the death of Birvin Brooks was the proximate result of such explosion. It seems to follow that the Government should be held accountable for the death and damage to the estate if it was under a legal duty to the deceased at the time with respect to the safety of the premises, and failed to perform such duty, unless deceased was guilty of some act of contributory negligence.

■ There appears to be no evidence justifying a finding of contributory negligence, and this contention of the Government is not upheld. The vital questions are: (1) was the Government under a legal duty to deceased with respect to the safety of the premises, and if so: (2) did the Government fail to perform it. The Government insists that there was no duty whatever resting upon it, because (a) full control of its property, including the pump house and other fire protective facilities, had been committed to Convair by the contract of November 14, 1942, and that thereafter and up to the moment of the fatal explosion Convair exercised such control and carried on a regular program of inspection of the entire premises; and (b) because Doyle & Russell, the general contractor, and R. S. Jordan Co., the sub-contractor, were independent contractors, relieving the Government of liability to their employees. In its findings of facts the Court has held the Government to be correct in its assertion of the facts upon which the conclusion is based, but whether the conclusion is legally sound is a more troublesome question. It is true, as has been found, that full control of the facilities had been relinquished to Convair and that Convair assumed control and responsibility for the safe condition of the premises with respect to the performance of the contract which it had entered into with the Government, but it must be considered that the Government, for the purposes of the contract with Doyle & Russell providing for the installation of additional facilities including a third pump in the pump house, reassumed control of its pump house and the facilities therein to that extent; and even though it be true, as the Court has found, that both the general contractor and the sub-contractor were, so far as the Government was concerned, independent contractors, it still remains to be determined what duty the Government owed Birvin Brooks, who was an invitee upon the premises and whether or not such duty, if any existed, was fully performed. It cannot be seriously said that Birvin Brooks was not lawfully upon the premises, or that he was not engaged in his work thereon upon the implied invitation of the Government. He was, therefore, an invitee.

■ The general rule as laid down in 30 Am.Jur., page 754, sec. 96, is that an owner of lands or buildings who impliedly invites another to enter for some purpose of interest or advantage to him, owes to such person a duty to use ordinary care to have his premises in a reasonably safe condition and to warn of hidden dangers which he should have known. This rule is upheld in Carpenter v. Sinclair Refining Co., 237

Mass. 230, 129 N.E. 383, which is cited by defendant, and by several North Carolina cases: Ellington v. Ricks, 179 N.C. 686, 102 S.E. 510; Leavister v. Jesse French & Son Piano Co., 185 N.C. 152, 116 S.E. 405. The Court has found as a fact that the death of the deceased did not result from the negligence of the Government, not because the Government owed no duty, but because the plaintiff's evidence does not show a failure to discha1ɟe it. Under the circumstances existing on the fatal morning, the Government having reassumed control of the pump house within which the work was being done, for the purpose of the contract with Doyle & Russell and the contract between Doyle & Russell and R. S. Jordan Co., it owed to the deceased, under the general rule above set out, the duty to use ordinary care to have its premises in a reasonably safe condition and to warn him of hidden dangers which it should have known. It may be conceded that the premises at the time of the fatal explosion were not reasonably safe, leaving for consideration the question whether the Government exercised ordinary care to have it so, or failed to warn of hidden dangers of which in the exercise of ordinary care it should have known.

■■■ As stated in 38 Am.Jur., page 756, section 96: "Obviously the duty of the owner or an occupant to an invitee depends upon the circumstances surrounding the invitation, including the character of the premises which the visitor is invited to use, the nature of the invitation, the conditions under which it is extended, and the use of the premises to be made by the invitee". The determination of whether there was a failure to discharge the duty resting upon the Government should be reached in the light of these factors. Ordinary care is "that degree of care which a prudent man should use and exercise under like circumstances and charged with like duty." Evans v. Shea Bros. Construction Co., 194 N.C. 31, 33, 138 S.E. 411, 412. What degree of care then would a prudent man have exercised if faced with the circumstances which existed at the date of the contract with Doyle & Russell,—years after full

control and responsibility for safety of the premises had been committed to a reliable company (Convair) which had assumed such responsibility and had established a fully manned safety program, when it is taken into consideration that on the date of that contract between the Government and Convair the premises were in a safe condition. There was no reason for the Government to believe or suspect that Convair had failed in its responsibility; there was nothing about the nature of the work to be performed to cause apprehension for the safety of those who would be required to go upon the premises in order to carry out the contract with Doyle & Russell, and under it with R. S. Jordan Co. Nothing happened subsequent to the date of the contract with Convair, and no fact or circumstance came to the attention of the Government between that date and the fatal day to put the Government on notice that the condition of the premises had changed. Certainly, the work to be done was not inherently dangerous and the occurrence, it must be admitted, was unusual and out of the ordinary. It is true, of course, that an explosion such as that which occurred, might be expected when a spark is created in a tight compartment in which the air is highly saturated with gasoline vapors, but would a prudent man or a man of ordinary prudence foresee the necessity of guarding against the condition which came about. The Government had no notice that there was a leak in the gasoline pipeline and had no notice that the pump in the dry well was out of order; the condition of each was safe and proper when control was relinquished to Convair. It seems that the answer to this question should be in the negative; to hold otherwise would amount to making the Government an insurer of the safety of the premises. The decisions do not impose this heavy burden upon the owner of premises in a case such as this.

The Government, having discharged the duty to Birvin Brooks imposed upon it by law, is not responsible for his death, and a judgment accordingly will be entered.